Jones, Judge,
delivered the opinion of the court:
On February 20, 1935, plaintiff entered into a contract with the defendant to furnish and deliver approximately 300,000 barrels of low-heat Portland cement to a reservoir dam site near Grafton, West Virginia. The consideration named was $1.70 per barrel, with a proviso that if at the date of any shipment the current destination price was below the price bid the defendant should have the advantage of such reduced price. Delivery was to cover a period of two and one-half to three years.
The specifications contained this further paragraph:
1-10. Adjustment in contract price as a result of fluctuation of freight rates. — If after the date and hour of opening bids and continuing throughout the course of the contract, there is any change in the official railroad freight rates existing and published at the time of opening bids, the contract price for cement shall be adjusted accordingly, any increase in cost resulting from an increase in freight rates will be borne by the Government and any decrease in cost resulting from a decrease in these rates will be deducted from payments to the contractor.
Soon after the contract was made the freight rates were increased on cement shipped from the point of manufacture to the point of delivery. There was also an increase in freight rates on the coal and iron pyrites cinder used by plaintiff in the manufacture of cement. Plaintiff was reimbursed for additional freight charges on the cement that was delivered. It was not reimbursed for the increased freight charges which it paid on the raw materials used in the manufacture of the cement. For this latter amount it sues.
*201 The question is whether under the contract and specifications it should be reimbursed for the increased freight charges which it paid on the shipment of such materials.
In the invitation for bids the plaintiff, together with all other bidders, was asked to and did furnish information as to the freight rate on cement from mill to destination, as well as the railway mileage between these two points. No information was requested regarding freight rates on raw materials to be used in manufacture, nor as to the distance that such raw materials would be hauled.
In invoicing the various shipments plaintiff included the increased freight charges it had paid on cement. These bills were paid as rendered. There were 246 separate invoices. All these included the increased charges on cement. In none of them did the plaintiff render or make any claim for in-oreased freight charges paid on the raw materials used in the manufacture of the cement. The first shipment of cement was made on May 17,1935, and the last shipment on November 5,1937.
On July 30, 1938, plaintiff filed a claim with the contracting officer for additional compensation in the amount of $1,477.59 to cover additional freight charges which it had paid on coal and iron pyrites cinder used by the plaintiff in the manufacture of the cement furnished by it to the defendant. This was the first claim filed with the defendant for such additional freight charges. The contracting officer denied the claim on the ground that adjustments for freight charges under the specifications were confined to the finished product, i. e., to cement, and that they did not embrace the raw materials which were used in the manufacture of such product.
Plaintiff insists that it was not possible to submit its claim for increased freight charges on raw materials at the time the various shipments of cement were made, because such raw materials went into the manufacture not only of low-heat cement for the Government, but into low-heat and other standard grades of cement for commercial use, and also because there was no separation of Government cement from the bulk until orders for stated quantities were received from the War Department.
*202 We think the contracting officer rightly denied reimbursement for the additional freight charges paid by plaintiff upon coal and iron pyrites cinder.
If the language of paragraph 1-10 of the specifications were standing alone it would be difficult to determine whether it should be limited to the changes in freight rates on cement alone, or whether it should also include the freight rate changes on the shipment of raw materials used in its manufacture. However, when it is construed in connection with the other provisions of the contract and specifications and the conduct of the parties, it seems rather clear that the parties had in mind at the time of the making of the contract only the freight rates on the cement. The invitation for bids asked only for existing freight rates on cement and the railway mileage between the manufacturing plant and the point of destination. It made no reference to freight rates or distances in connection with any raw materials that might be used. There was no reference in either the contract or the specifications or any of the information asked or furnished that threw any light on what raw materials would be used, where they would be shipped from, or the sources from which they would be obtained. All the shipments were made and the terms of the contract fully carried out over a two and one-half year period. While some of the witnesses for the plaintiff testified that they had discussed among themselves the question of increased freight rates on coal and other raw materials within a month after the shipments began, no formal claim or written evidence of such claim was filed until several months after the last shipment was made and paid for. Not until several months after the last shipment was made and paid for was any claim made for increased freight charges paid on raw materials.
In the light of these undisputed facts and circumstances it would require a rather strained construction to include the increased freight charges on raw materials as being within the contemplation of the parties.
The petition should be dismissed. It is so ordered.
MaddeN, Judge; Whitaker, Judge; LittletoN, Judge; and Whaley, Chief Justice, concur.